THE STATE ex rel. HARMONY DRAINAGE DIS-
TRICT v. GEORGE E. HACKMANN, State
Auditor.

In Banc, December 18, 1924.

1. **DRAINAGE DISTRICT: Retards in Navigable Stream to Protect
Bank Erosion.** Under the Act of 1921, Laws 1921, page 303, amend-
ing Section 4477, Revised Statutes 1919, a drainage district may be
organized for the sole purpose of constructing permeable tree re-
tards in a navigable river to divert its waters and to prevent them
from washing away its banks, where, unless such retards are con-
structed, the lands of the district will presently be subject to over-
flow and will be overflowed by the waters of the river; and the
cost of constructing such retards may be taxed against the lands of
the district, although no drainage ditch or other levee has been
constructed or is contemplated.

2. ———: ———: ———: **Act of 1921: Bank Protection: Navigable
Streams.** The Act of 1921 introduced into the statute the new
element of protection.  Prior thereto its principal object was to
drain land; the amendment declared the object to be to drain or
protect; and along with the word "protect" were added the words
"bank protection, current control," and the whole act authorizes
the formation of a drainage district to protect land by bank pro-
tection and current control, and the bank protection is not limited
to non-navigable streams.

3. **STATUTE: Amendment: Title: Reference to Number: Kindred Sub-
ject.** If the title of the statute to be amended is sufficient to em-
brace the provision contained in the amended act, the title of the
amended act declaring its purpose to amend such statute is suf-
ficient.  The Act of 1921, Laws 1921, page 303, was: "An Act to

State ex rel. Drainage District v. Hackmann.

amend Section 4477 of Article IV of Chapter 28 of the Revised Statutes of Missouri, 1919, by inserting certain words, adding a proviso thereto, and repealing all conflicting acts or parts of acts," and the title prefixed to said Article IV was: "Construction and Improvement of Ditches, Watercourses and Levees, by County Court, Upon Petition of One or More Landowners." *Held*, that the title of the Act of 1921 was sufficient to embrace an amendment to said Section 4477 authorizing the formation of a drainage district in the county court for the sole purpose of protecting river banks from erosion by the construction of retards in the bed of a navigable stream, where the destruction of the banks by erosion will subject the adjacent lands to overflow, the subject of the article, "Construction and Improvement of Ditches, Watercourses and Levees," carrying on its face suggestions of measures for the reclamation and protection of lands from the effects of water by use of such retards.

4. ———: ———: **Levee.** The word "levee," as ordinarily used in drainage acts, means an artificial mound of earth intended exclusively as a protection from overflow; but a natural bank serving the same purpose, namely, protecting adjacent low lands from overflow, may well be held to be a levee within the purview of such acts.

5. **RETARDS IN NAVIGABLE RIVER:** Affirmative Authorization of Congress. Section 9903, Comp. Stat. U. S. 1918, is an affirmative authorization by Congress of the construction by a duly organized drainage district of permeable tree retards in the bed of the Missouri River.

6. **MANDAMUS:** Suit Pending. Before a prior suit can be held to bar or stay a mandamus suit it must be made to appear that not only are the parties the same, but that adequate relief can be obtained in the proceeding first instituted.

Citations Pertaining to Subjects of Headnotes: 1, Levees, 36 C. J. pars. 6, 19 (1926 Anno); 2, Levees, 36 C. J. par; 6; 3, Statutes, 36 Cyc. 1029; 4, Levees, 36 C. J. par. 1; 5, Levees, 36 Cyc. par. 6; 6, Mandamus, 26 Cyc. 184.

## *Mandamus.*

Peremptory writ awarded.

*Dan V. Herider* and *A. B. Hoy* for relator.

(1)   The relator has no remedy except by writ of mandamus.   An affirmation of the judgment of the circuit court in the case pleaded by respondent as pending in this court would afford no relief to relator, for the reason that such judgment does not reach the respondent herein.   State ex rel. v. McCracken, 60 Mo. App. 650; Barnes v. Gottschalk, 3 Mo. App. 111; State ex rel. Craig v. Dougherty, 45 Mo. 294; State ex rel. v. Hackmann, 274 Mo. 551.   (2)   Every presumption in favor of the validity and constitutionality of the Act of 1921, will be indulged, and the act will not be held unconstitutional unless it plainly violates some provision of the Constitution and there is no escape from such conclusion.   State ex rel. v. Burton, 266 Mo. 711; Greene County v. Lydy, 263 Mo. 77;   State v. Kirby, 260 Mo. 120; Kansas City v. Land Co., 260 Mo. 395.   (3)   The subject of "Drainage and Reclamation of Swamp and Overflow Lands" has been held broad and comprehensive enough to authorize the enactment of any legislation which has for its object the reclamation or protection of lands from the effects of water.   Birmingham Drain. Dist. v. Ry. Co., 266 Mo. 60;   Houck v. Little River Drain. Dist., 248 Mo. 373, 239 U. S. 254.   It is sufficient if the title to a statute does not mislead as to the chief topic of the act and that the main features of it have a reasonable and material connection with the subject named in the title.   OBrien v. Ash, 169 Mo. 283; In re Burris, 66 Mo. 442;   State ex rel. v. Mead, 71 Mo. 266;   Burge v. Railroad, 244 Mo. 76.   Reference to a statute by number is sufficient.   State v. Heege, 135 Mo. 112;   State v. Marion Co. Court, 128 Mo. 427.   (4) The great fundamental rule in construing statutes is to ascertain and give effect to the intention of the Legislature.   36 Cyc. 1106;   Eaton v. Gmelich, 205 Mo. 152; Armstrong v. Modern Brotherhood, 132 Mo. App. 171. It is the duty of the court so far as practicable to

reconcile the different provisions so as to make them consistent and harmonious and to give a sensible and intelligent effect to each. 36 Cyc. 1129; Stump v. Hornbeck, 94 Mo. 26; State ex .rel. Tuller v. Seehorn, 246 Mo. 568. (5) The permit from the Federal Government secured by the county court, is prima-facie sufficient. Secs. 235, 9903, 9910, United States Compiled Statutes 1915.

*Jesse W. Barrett*, Attorney-General, and *W. L. Vandeventer*, Assistant Attorney-General, for respondent.

(1) The statute does not authorize the county court to levy taxes against lands in a drainage district for the sole purpose of constructing retards in the Missouri River. (a) A municipal corporation possesses such powers and such only as the State confers upon it. 28 Cyc. 257, 258, 263; Rehill v. Jersey City, 71 N. J. L. 109; Farwell v. Seattle, 43 Wash. 141; The Mayor v. Ray, 19 Wall. (86 U. S.) 475; City to use v. Eddy, 123 Mo. 546, 557; City of Independence v. Cleveland, 167 Mo. 384. (b) The usual drainage district, such as one organized under the Circuit Court Drainage District Act, is a public corporation, but its powers are very much less than those granted to a municipal corporation. It is at most only a *quasi*-municipal corporation. Such a district is organized merely for a special and limited purpose. Its powers are restricted to such as the Legislature has deemed essential for the accomplishment of that purpose, and it is only authorized to raise funds for the specific objects mentioned in the statute. Elmore v. Drainage Comrs., 135 Ill. 277; State ex rel. Caldwell v. Little Riv. Drain. Dist., 291 Mo. 72; Sherwood v. Drainage District, 298 Mo. 82; State ex rel. Hausgen v. Allen, 298 Mo. 448; 9 R. C. L. p. 644, sec. 33; Morrelton Imp. Dist., 71 Ark. 4; Board of Improvement v. Moreland, 94 Ark. 380; Drainage District v. Campbell, 154 Mo. 157. (c) The county court has no power to

straighten, widen, alter or deepen a navigable stream. The statute limits and restricts its operation to "natural streams—not navigable." Sec. 4477, Laws 1921, p. 304; Sec. 4477, R. S. 1919; State ex rel. v. Taylor, 224 Mo. 397. (d) The main purpose contemplated by the statute is the construction of a ditch. The construction of a levee is to be an incident to the construction of the ditch. The construction of retards in the bed of a navigable river is not contemplated at all. The construction of "permeable tree retards" extending from one hundred to three hundred feet into the bed of the Missouri River, at right angles to its bank, are not incidents of either a ditch or levee. Certainly the construction of such retards as the sole improvement, with no provision whatever for ditches or levees, is not contemplated by the statute. Sec. 4477, Laws 1921, p. 304; Secs. 4478, 4480, 4484, R. S. 1919; Royse v. Railroad Co., 160 Ind. 592. When the statute is read as a whole it is clear that it spends its force on the construction of ditches, together with such other works, such as levees and lateral ditches, as are necessary to make the ditches effective as channels to carry off overflow waters. In addition to the sections cited above, see Secs. 4506, 4508, 4511, 4512, 4513, 4518, 4519, 4522, R. S. 1919. See also S. W. Mo. Light Co. v. Scheurich, 174 Mo. 235. Article 4 had its origin in the Act of 1897, Laws 1897, p. 146. Section 1 of that act provides only for the construction of "any ditch, drain or watercourse," and those words have been retained in all subsequent amendments. (e) The history of Article 4 shows that the construction authorized by it was ditches to drain and reclaim swamp and overflowed lands, and such other incidental works as were necessary to make the ditches effective. Such purpose is manifested by the title of the original act and all subsequent amendments. Laws 1897, p. 146; Laws 1899, p. 278; R. S. 1899, sec. 8278 et seq.; Laws 1903, p. 234; Laws 1905, p. 180; Laws 1907, p. 341; Laws 1909, p. 632; R. S. 1909, sec. 5578 et seq.; Laws 1919, p. 294. For the

305 Mo.—44.

purpose of arriving at the intention of an act, courts
look to its title, and read it and every part of the act
together.   State v. Whitaker, 160 Mo. 69.   (f) Neither
in the first report or the second report of the viewers
and engineer was there any statement, nor in the order
of the county court approving their first report or in
the order confirming their second report, was there any
finding that any of the lands in the district had ever
overflowed or that they were subject to overflow.   It is
clear that the purpose of the proposed improvements
was not to prevent the waters of the Missouri River from
overflowing the lands of the district, but that the sole
and only purpose was to deflect, divert and alter the cur-
rent of the waters of the Missouri River and thereby pre-
vent the erosion of the river bank.   (g) There must be
distinct authority of law for every levy of taxes. Taxes
cannot be levied by counties or municipalities except
for the very purpose, in the manner and under the con-
ditions prescribed by law.   Railroad v. Apperson, 97
Mo. 308;   State ex rel. Clinton County v. Ry. Co. 87
Mo. 236; State ex rel. Aull v. Shortridge, 56 Mo. 129;
Kansas City v. Bacon, 157 Mo. 463.   The General
Assembly can grant to counties or other municipal
corporations power to levy taxes ''for county and other
corporate purposes,'' and for those purposes only;
and the grant must be made in clear and unambiguous
terms.   Sec. 1, Art. 10, Mo. Constitution;   City of St.
Louis v. Laughlin, 49 Mo. 562; Brooks v. Schultz, 178
Mo. 222.   Whether the tax be a general *ad valorem* or
special assessment for local improvement, it still must
be for a corporate purpose.   ''Every tax must rest on
a public purpose to which its proceeds must be devoted.''
The power to tax ''is measured by its purposes.'' Houck
v. Little Riv. Drain. Dist., 248 Mo. 384.   (h) The con-
struction of retards in the bed of the Missouri River
for the purpose of deflecting and diverting its waters
is not a ''corporate purpose'' of a drainage district,
for the reason that the Government of the United States

has jurisdiction over the bed of the river and its waters from bank to bank, and the State has no authority over its bed, and cannot interfere with its waters. To construct retards in the Missouri River, at right angles to its bank, extending one hundred feet or more into its bed, is not a corporate purpose of the State or of the county, or of a drainage district organized by the county, and a district organized for that sole and only purpose is beyond and in excess of the corporate powers of either. 8 Ency. of U. S. Supreme Ct. Rep. 815; United States v. Rio Grande Irr. Co., 174 U. S. 703; Economy Light Co. v. United States, 256 U. S. 123; Cole v. Dooley, 137 Mich. 419; In re Doney Drain. Dist., 129 Wis. 138; In re Horlcon Drain. Dist., 136 Wis. 227; Bixby v. Parish, 148 Wis. 424; Fulton Light, H. & P. Co. v. State, 200 N. Y. 400. (i) The purposes for which drainage districts are created, in this State and every other State, is to reclaim wet and overflow lands, or lands subject to overflow, from surface waters, by the construction of artificial channels, levees and other works incident to efficient ditches and levees, and their operation has always been confined to such works. No statute of any State has been found that authorizes the creation of a drainage district for the sole purpose of constructing retards in a navigable stream. In every Missouri act the improvements to be constructed always include either a ditch or levee, or both. (j) The record shows that the proposed improvements are to be constructed entirely outside of the boundary lines of the drainage district. The boundary line is the north bank of the Missouri River, and the retards are to be constructed at right angles with the bank and to extend one hundred feet or more out into the bed of the river, and they are to extend from the bed of the river to the surface of the water, and are to be anchored to piling submerged entirely below the line of scour. No part of them is to be constructed within the boundary line of the district. The most that can be said of them is that their southern

ends will reach the boundary line. Such retards are not a public improvement. Low v. Mayor, 5 Cal. 214; Schneck v. City of Jeffersonville, 152 Ind. 214; Risley v. Village of Howell, 57 Fed. 547. (k) "A navigable stream cannot be improved and the cost thereof levied by a special assessment upon the real estate fronting on such watercourse." People v. Economy Power Co., 241 Ill. 328. (2) A numerical reference to the section sought to be amended is a sufficient title to "an act which deals exclusively with the subject of the section to be amended." State v. Mullinix, 257 S. W. (Mo.) 123; State ex rel. v. Ranson, 73 Mo. 88. But it must deal "exclusively" with "the subject of the section to be amended." State ex rel. v. Heege, 135 Mo. 118; State ex rel. Park Dist. v. County Court, 102 Mo. 538; State v. McEniry, 269 Mo. 228; State ex rel. v. County Court, 128 Mo. 439; State v. Great West. Coffee & Tea Co., 171 Mo. 634; Williams v. Railroad, 233 Mo. 667; Wood & Pritchard v. McClure, 96 So. (Ala.) 577; State v. Parker Dist. Co., 237 Mo. 103; State v. Helton, 255 Mo. 170; Asel v. City of Jefferson, 287 Mo. 205; Bachelor v. State, 139 N. E. (Ind.) 182. (3) The Missouri River is a navigable stream, and Congress alone has jurisdiction over its bed and waters from bank to bank and the State of Missouri has no authority (a) to place obstructions "not affirmatively authorized by Congress" in its bed or to interfere with the flow of its waters at any point outside of established harbor lines; and (b) even after they have been affirmatively authorized by Congress, it is unlawful to build or commence the building of any such obstruction except upon plans recommended by the Chief of Engineers and authorized by the Secretary of War. Secs. 9 and 10 of Rivers and Harbors Act of March 3, 1899, 30 U. S. Stat. at Large, chap. 425, p. 1151. These two sections of the Act of March 3, 1899, may be summarized as follows: "First, the creation of any obstruction to the navigable capacity of any waters of the United States

is prohibited unless affirmatively authorized by Congress; second, it shall not be lawful to build any structure in a navigable river or water of the United States, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; and, third, it shall not be lawful to excavate or fill the channel of any navigable water of the United States unless such work is recommended by said Secretary of War prior to beginning the same." Hubbard v. Fort, 188 Fed. 992. The "Secretary of War's authorization is a mere license to do the work, and not a grant of power to do it." Cobb v. Lincoln Park, 202 Ill. 437; Wilson v. Hudson Co. Water Co., 76 N. J. Eq. 559; Lake Shore & Mich. Ry. Co. v. Ohio, 165 U. S. 368. It is for Congress to decide what shall or shall not be deemed in judgment of law an obstruction to navigation. Philadelphia Co. v. Stinson, 223 U. S. 635; City of Newark v. Railroad, 287 Fed. 197. See also 9 Fed. Stats. Ann. (2 Ed.) pp. 36 to 56, 81 to 86; 8 Ency. U. S. Supreme Ct. Rep. p. 815. (a) It is not contended that Congress "affirmatively authorized" the construction of retards in the Missouri River, by a special act referring to Cambridge Bend, or by any general statute applicable thereto. There is no statute of Congress affirmatively authorizing the construction of retards in any navigable stream outside of established harbor lines, and without such affirmative authorization the creating of such an obstruction is expressly "prohibited" by said Section 10, even though the plans were recommended by the Chief of Engineers and authorized by the Secretary of War—and it is certain that the purported "permit," signed only by a typewriter, who might have been a clerk, and done in the name of a subordinate, a colonel of engineers, Western Division, was not a recommendation of the Chief of Engineers or authorized by the Secretary of War, neither of whose names anywhere appears on the paper. (b) Congress had assumed jurisdiction by said Act of 1899, over the navigable waters of the United States

and thereafter no obstructions could be placed in the Missouri River, except by the affirmative authorization of Congress, and all attempts by the State to divert its waters or to change its channel or otherwise interfere with the current of their flow was wholly beyond and in excess of the powers of the State. Not only had Congress by said statutes assumed jurisdiction over the navigable waters of the United States and had expressly declared that any interference therewith ''not affirmatively authorized by Congress'' was unlawful and prohibited, but the record in this case shows that the Federal Government had assumed actual jurisdiction of that very part of the Missouri River upon which the county court had originally determined to trespass and had itself begun the construction of retards ''located approximately in part of the same positions as originally planned by the district.'' On this ground alone the State Auditor was justified in refusing to register the bonds. (c) Section 9903, U. S. Compiled Statutes 1918, cited by relator does not help their case. Said section is a part of the Act of Congress of June 13, 1902, Sec. 1, chap. 1079, 32 Stat. at Large, p. 371. Said section specifically says that the improvement ''must not impede navigation.''

RAGLAND, J.—Upon re-assignment of this case, on December 3, 1924, it fell to the lot of the writer to prepare the opinion. It is an original proceeding in mandamus, in which it is sought to compel respondent, as State Auditor, to register one of an issue of bonds of relator, a drainage district organized under the provisions of Article IV, Chapter 28, Revised Statutes 1919, as amended by the Act of 1921, Laws 1921, page 303.

The lands assumed to have been incorporated into the drainage district in question consist of approximately 4881 acres, lying in a sharp bend of the Missouri River in the shape of a peninsula. The river runs along the north line of the district in an easterly direction for a

distance of about five miles, and then turns abruptly and runs in a southwesterly course. A short distance south of the turning point it is crossed by the Chicago & Alton Railroad and the state highway. After crossing the river these two highways run westwardly along and near the river bank and paralleling it.

The lands embraced within the district are not subject to overflow except contingently. The petition to incorporate them into a drainage district, addressed to the county court, alleged: "that the present wash or bank erosion of the lands in said district will continue unless protection be had and will wash away the lands in said district near the river now protecting the entire district from overflow, and will result in all the lands and other property in said district being subject to overflow and being overflowed by the Missouri River, to the detriment of the public health," etc.

The viewers and engineer sent out by the county court to determine approximately the proper character, dimensions, location and probable cost of the improvement necessary to accomplish the object of the petition reported:

"The character of the improvement would consist of a series of permeable tree retards, constructed at approximate right angles to the bank, cabled securely together and anchored to re-inforced concrete piling completely submerged below the possible line of scour. The retard itself to be built from the bed of the river to above the surface of the water and from the bank out into the stream for a distance varying from one hundred to three hundred feet in length. In general these structures will be placed along the north line of the proposed district from a point in the northwest quarter of Section 1, Township 51 North, Range 19 West, and extending along the river bank to a point in the northeast quarter of Section 3. The main work would have to be installed along the bank lines through said Sections 3, 4 and 5. The work contemplated in Section 1, above

referred to, would be for the purpose of preventing further unravelling or destruction of the existing installation and to prevent the river from flanking said work or possibly cutting through into the lower lands immediately to the south. The structures installed through Sections 3, 4 and 5 would be placed an approximate distance of eight hundred feet apart, which locations are shown on the map attached hereto. The probable cost of said work has been estimated at two hundred thousand dollars ($200,000)."

Pending the proceeding in the county court to get the drainage district incorporated and functioning, the current was all the while cutting away the river bank along the north side of the district. So rapidly was this erosion taking place that it was feared the river would break through and form a new channel from three to four miles south of the railroad and highway bridges, leaving those structures high and dry. As a result of this apprehension the Chicago & Alton Railroad Company and the State Highway Commission, cooperating with the War Department, immediately began the construction of most of the improvements contemplated through the formation of a drainage district. The engineer and viewers sent out by the county court the second time, for the purpose of establishing the precise location, dimensions and formation of the proposed improvement reported:

"The district has a frontage on the Missouri River along the north line of the district approximately five miles. Two miles of this front is already revetted with bank protection and other interested parties have already contracted and are now constructing additional bank protection for a considerable portion of the remaining frontage. There are, however, two points along the front where it is essential that bank protection work be installed for the protection of the district. At these two points protection work will not only give the desired protection for the district, but will safeguard and com-

plete other work which is now giving partial protection to the lands and other properties in the district. Since the survey was made in October, 1923, a survey on March 26th showed that the river had cut back a distance varying from 100 feet to 500 feet and had now arrived at a point where in one place it was within 95 feet of the right-of-way of the Chicago & Alton Railway.

"In general, the soil is sandy and as a consequence the banks of the river are readily subject to erosion. A swail extending through section three across the lands of Amelia Kessler and Mr. Friemnoth provide an added threat to the possibility of the river ultimately breaking through the point now extending immediately above the railway and highway bridges.

"In general the plan calls for the construction of three standard current retards of the same type as are now being constructed by the Highway Department with the cooperation of the War Department at the same location."

The character and construction of the retards recommended are described in the excerpt from the viewers' first report heretofore set out. The cost of their installation was estimated at $20,000.

After the confirmation of the final report of the viewers and engineer, which included an assessment of benefits and damages, and the levy of the tax, the property owners were given an opportunity to pay in cash. Some of them availed themselves of this opportunity, but there remained to be raised by an issue of bonds the sum of $11,785. A contract was let for the work and an order was made by the county court for the execution, issuance and sale of the requisite bonds. One of such bonds was presented to respondent for registration which was refused.

It is conceded that the entire proceeding, from the filing in the county court of the petition for the incorporation of the drainage district to the presentation of one of its bonds for registration, was in every respect regular.

Respondent bases his refusal to register the bond tendered him for that purpose on these grounds:

(1) That neither Article IV of Chapter 28, Revised Statutes 1919, nor the Act of 1921 by which Section 4477 of said Article was attempted to be amended, contemplates or provides for the organization of a drainage district for the sole purpose of constructing retards in a navigable river to prevent bank erosion; (2) that if said Section 4477 be construed to authorize the construction of retards in navigable streams, then it is unconstitutional, because no such subject is embraced within the title of the amendatory act or that of the act amended; and (3) that as the Missouri River is a navigable stream neither the State of Missouri nor any public corporation of the State has power to construct retards or other obstructions in the bed of said river without a previous authorization thereto by Congress, which has never been given. Respondent further sets up in his return that ''at the May Term of the Circuit Court of Saline County, Missouri, there was filed a suit entitled J. C. Frilley et al. v. Robert L. Hyatt et al., Justices of the County Court of Saline County and others, in which suit all of the issues presented in relator's petition and this return were raised and said suit was determined in favor of the defendants and an appeal to this court was granted to the plaintiff, and that therefore this proceeding will not lie because relator has, in said appealed case, an adequate remedy.''

I. Section 4477, Revised Statutes 1919, as amended in 1921 (the italicized words being those added by the amendment) is as follows:

''When it shall be conducive to the public health, convenience or public welfare, or when it will be of public utility or benefit, the county court of any county in this State shall have the authority to organize, incorporate and establish drainage districts and to cause to be constructed, straightened, widened, altered or deepened, any ditch, drain, natural stream—not navigable, *bank*

*protection, current control,* or watercourse, when the same is necessary to drain *or protect* any land or other property. The word 'ditch' as used in this article shall be held to include a drain, watercourse, *bank protection, current control* or levee or any drain, watercourse, *bank protection, current control* or levee hereafter constructed. The petition for any such improvement shall be held to include any side, lateral, spur, or branch, ditch, drain, watercourse or levee the lowering of any lake, *the protection of the banks of an adjacent stream from wash, cutting or erosion* or any other work necessary to secure fully the object of the improvement, petitioned for, whether the same is mentioned in such petition or not. *Provided: That in the event any work is to be done upon any navigable stream, the consent of the federal government shall be obtained to make such improvement or improvements before the actual work on the improvement shall be begun."*

.It is the contention of respondent that this statute does not authorize the construction of "bank protection," except as an incident to drains, ditches and levees —the means ordinarily employed for the reclamation of wet or marshy lands: that it does not contemplate the organization of drainage districts for the sole purpose of protecting the banks of a navigable stream from erosion. It cannot be supposed, of course, that the Legislature intended that "bank protection," if for the purpose of improving the navigability of such streams as the Missouri River, should be constructed and paid for by special assessments levied upon the lands bordering upon such streams. Such an enterprise would have none of the elements of a local improvement, but be wholly public in its nature. [People v. Economy Power Co., 241 Ill. 290.] Nor could it have been the legislative purpose merely to protect from erosion the lands fronting on such streams. An improvement made with that end in view would not be one conducive to the public welfare, but one for the sole benefit of the owners of the lands subject to erosion.

*Retards in Navigable River.*

In the instant case it was alleged, and the county court found, that unless the river bank along the north side of the proposed district is protected from erosion, the whole district will presently be subject to overflow, and will be overflowed by the waters of the Missouri River. If the lands were now subject to overflow, there would be little doubt but that a drainage district organized under the statute under review could construct and install in the river such current retards as might be necessary to protect its levees. Respondent seems to concede as much. Must the land owners then wait until the natural barrier is gone and they have re-placed it with an artificial one before they can take steps to keep the waters off their lands by means of bank protection? Neither would it be contended that a district could not be organized under this statute for the sole purpose of constructing a levee if the lands within the confines of such district were now subject to overflow. Is it any less within the purview of the statute to preserve a high bank that performs all the functions of a levee?

The amendment of 1921 introduced into the statute the new element of "protection." Prior to the amendment its principal objective was to "drain" land; now it is to "drain or protect" land. Along with the word "protect" the words "bank protection, current control" were introduced. There must have been some connection between them in the legislative mind. The amendment was evidently intended, among other things, to bring into the statute a specific authorization to form drainage districts to "protect" land by "bank protection, current control." And the "bank protection" contemplated is not limited to non-navigable streams; otherwise, there would not have been added a proviso making the General Government's consent necessary when such work is to be done upon a navigable stream. The statute has been built up by repeated amendments. As a result it presents many crudities, but the legislative

intent just referred to, as embodied in the amendment of 1921, we think clearly appears.

II.    Respondent's next contention is that the Act of 1921, if it be construed to authorize the formation of drainage districts for the sole purpose of protecting river banks where their destruction by erosion would subject the adjacent lands to overflow, is to that extent unconstitutional, because no such provisions are embraced within the subject expressed in its title.    The title is as follows:

Title.

"An Act to amend Section 4477 of Article IV of Chapter 28 of the Revised Statutes of Missouri, 1919, by inserting certain words, adding a proviso thereto, repealing all conflicting acts or parts of acts and with an emergency clause."

"The practice of amending statute laws by reference to the sections contained in the volumes of authorized revisions of the laws of this State is the established law."    [Burge v. Railroad, 244 Mo. 76, 87.]

"If the title of an original act is sufficient to embrace the provision contained in an amendatory act, it will be good, and it need not be inquired whether the title to the amendatory act would, of itself, be sufficient." [Brandon v. State, 16 Ind. 197; approved by this court in a number of cases, including State v. Doerring, 194 Mo. 398, 413.]

"The title of the original act" for the purpose in hand is the title of the act as it appears in the Revision of 1919. [State ex rel. v. Ranson, 73 Mo. 78, 88; Burge v. Railroad and State v. Doerring, supra.]    Original Section 4477 and its cognate sections constitute Article IV of Chapter 28 of the Revised Statutes of Missouri, 1919. The title prefixed to that article is: "Construction and Improvement of Ditches, Watercourses and Levees, by County Court, Upon Petition of One or More Landowners." The question under consideration then resolves itself into this: Could the provisions of the Act of 1921 have been included in the original Article IV and

the article then enacted under the title just quoted, without violating the constitutional requirement that "no bill . . . shall contain more than one subject, which shall be clearly expressed in its title?"

The constitutional requirement is not directed against the generality and comprehensiveness of titles. Not only may the subject, generally speaking, be as comprehensive as the legislative discretion may choose to make it, but the statute relating to it may include every matter germane to, and having a natural connection with, the general subject of the act. [O'Connor v. Transit Co., 198 Mo. 622, 639.] The language of the subject, "Construction and Improvement of Ditches, Watercourses and Levees," carries on its face a suggestion of measures having for their main objective the reclamation, and protection, of lands from the effects of water, by use of the instrumentalities named. One class of those instrumentalities is levees. And the subject, "Improvement . . . of Levees," clearly embraces provisions for the preservation of levees  The word "levee," as ordinarily used in drainage acts, means an artificial mound of earth intended exclusively as a protection from overflow. [Royse v. Railroad, 160 Ind. 592.] And a natural bank serving the same function, namely, that of protecting adjacent low lands from overflow, might well be held to be a levee within the purview of such acts, though there were no specific provision so designating it. Certainly it cannot be said that there is no natural connection or relation between the protection of such banks, in order to preserve them as barriers against overflow, and the protection of levees, or that provisions for such bank protection are not germane to the general subject of construction and improvement of levees. It cannot be held therefore that the provisions "for bank protection" in the statute under review are unconstitutional on the ground that they are not expressed in the title of the act. [State ex rel v. County Court, 128 Mo. 427, 441.]

III.. Respondent's next contention is that relator cannot install current retards along the river bank without an affirmative authorization so to do by Congress. But if so, Section 9903, Comp. Stat. U. S. 1918, seems to confer the requisite authority. That section, so far as pertinent, is as follows:

*Authorization by Congress.*

"Any person or persons, corporations, municipal or private, who desire to improve any navigable river,.or any part thereof, at their or its own expense and risk may do so upon the approval of the plans and specifications of said proposed improvement by the Secretary of War and Chief of Engineers of the Army."

It sufficiently appears from the record that the con- ditions prescribed in the section have been complied with, in that, "the plans and specifications of said pro- posed improvement" have been approved by the Secre- tary of War and Chief of Engineers of the Army, such approval having been given in the mode prescribed by the rules and regulations of the War Department. In fact, the current retards which the drainage district pur- poses to install are component parts of the entire im- provement designed for the protection of the river bank along the north side of the district, and which is now being carried forward under the directions and supervi- sion of the engineers of the War Department by the State Highway Commission and the Chicago & Alton Railroad Company, and possibly by the United States itself. The contention of respondent under this head is disallowed.

IV. Respondent's final insistence is that this suit cannot be maintained because of the pendency of another and prior action involving the same issues. All that is disclosed by the record with respect to such action is contained in a paragraph of re- spondent's return which we have quoted at length. From these meager allegations, which in so far as they are allegations of fact stand admitted on the pleadings, neith-

*Mandamus.*

er the nature of the action, nor its subject-matter, nor the interest of the parties to the record therein, can be determined. Before a prior suit can be held to bar, or stay, an action in mandamus it must at least be made to appear, not only that the parties are the same, but that adequate relief can be obtained in the proceeding first instituted. [State ex rel. v. Speer, 284 Mo. 45, 53.] From aught that appears relator would still have to pursue the remedy it now invokes, in order to obtain relief, even if the issues involved in Frilley v. Hyatt, were all finally determined in accordance with the contentions it makes in that case. On the showing made, respondent's point cannot be sustained.

As all the conditions of the law with respect to the issuance of the bond presented to respondent for registration were complied with, it was his duty to register it.

Peremptory writ awarded. All concur, except *White* and *Walker, JJ.*, absent.